UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LARRY W. BRYANT,

    Plaintiff,

    v.

DONALD H. RUMSFELD, *et al.*,

    Defendants.

Civil Action No. 04–1125 (CKK)
Civil Action No. 05–64 (CKK)

**MEMORANDUM OPINION**
(March 12, 2007)

Plaintiff Larry W. Bryant filed the two related actions–Civ. No 04–1125 and Civ. No.
05–64–presently before the Court against the Secretary of Defense in his official capacity, the
Secretary or Acting Secretary of the Army, and in the latter case, the Acting Secretary of the Air
Force, the Secretary of the Navy, and Commandant of the United States Marine Corps, on June
30, 2004, and January 13, 2005, respectively.[1]  In Plaintiff's actions, he alleges that Defendants
have violated his rights under the First and Fifth[2] Amendments of the United States Constitution
by rejecting "paid advertisements" he submitted for publication in select Civilian Enterprise

---

[1]  The Court shall cite to these Complaints respectively as Plaintiff's First and Second
Complaint, with the understanding that Plaintiff's Second Complaint is not an amendment of the
First but rather refers to the Complaint in the later-filed action.

[2]  Plaintiff allegedly brings his actions pursuant to the Fourteenth Amendment as well.
*See* Pl.'s 1st Compl. ¶ 2; Pl.'s 2nd Compl. ¶ 1.  However, since in both of Plaintiff's actions, he
sues only federal and not state actors in their official capacities, it is clear from the face of
Plaintiff's Complaints that he brings no valid claims pursuant to the Fourteenth Amendment of
the United States Constitution:  "No State shall make or enforce any law which shall abridge the
privileges or immunities of citizens of the United States; nor shall any State deprive any person
of life, liberty, or property, without due process of law; nor deny to any person within its
jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.

Newspapers ("CENs").  Plaintiff specifically requests injunctive relief against Defendants such

that said advertisements will be published, recovery of any damages he has sustained, and

reasonable attorney's fees pursuant to 42 U.S.C. § 1988.  Both Parties filed dispositive motions,

which are now fully-briefed, in both related Complaints.

Upon a searching consideration of the aforementioned filings, Plaintiff's Complaints, and

the relevant statutes and case law, the Court shall DENY Plaintiff's Motion for Summary

Judgment, GRANT Defendant's Motion to Dismiss or for Summary Judgment, and DISMISS the

instant cases.

## I.  BACKGROUND

As stated above, Plaintiff filed his First Complaint on June 30, 2004, and his Second

Complaint on January 13, 2005.  Plaintiff's First Complaint pertains to rejection of Plaintiff's

"Blow the Whistle on Bush's 'Gulf of Persia' Resolution!" submission in the *Pentagram* CEN.

1st Compl. ¶¶ 1, 7.  Plaintiff's Second Complaint pertains to the rejection of six similar

submissions by Plaintiff by a number of CENs.  2nd Compl. ¶¶ 8, 11.  Both of Plaintiff's

Complaints contain two virtually identical counts.  Plaintiff's first counts allege that Defendants'

rejection of his submitted "advertisements" violates Judge Charles R. Richey's Order in *Bryant v.

Secretary of the Army*, 862 F. Supp. 574 (D.D.C. 1994).[3]  1st Compl. ¶ 27; 2nd Compl. ¶ 35.

---

[3]  Plaintiff also mentions in his Complaints (and attaches to his Motion for Summary
Judgment) a Consent Judgment entered by the United States District Court for the Eastern
District of Virginia in 1987 in *Bryant v. Secretary of Defense*, Civ. No. 86-1323-A (E.D. Va.
Apr. 15, 1987).  *See* 1st Compl. ¶ 17; 2nd Compl. ¶ 25; Pl.'s Mot. for Summ. J., Ex. 2 at 2.
While the Consent Judgment appears to have allowed Plaintiff to resubmit certain advertisements
for publication in CENs in 1987, Plaintiff does not make an argument with respect to said
Consent Judgment, nor does the Judgment itself contain any legal analysis or basis ("[t]his
consent judgment in no way indicates an admission of wrongdoing on the part of either party.").
Pl.'s Mot. for Summ J., Ex. 2 at 2.  Accordingly, in light of Plaintiff's failure to state a claim

Plaintiff's second counts allege that Defendants' rejection of the same violates Plaintiff's First Amendment and Due Process rights.  1st Compl. ¶ 29; 2nd Compl. ¶ 37.

The seven submissions Plaintiff attempted to have published in various CENs in 2003 and 2004 at issue in Plaintiff's Complaints are titled as follows: 1) "Blow the Whistle on Bush's 'Gulf of Persia' Resolution"; 2) "Blow the Whistle on Iraqnam's Battle-of-Baghdad Cover-Up!"; 3) "Blow the Whistle on ALL Atrocities at Abu Ghraib!"; 4) "Blow the Whistle on the Army-CIA McCarthy Saga!"; 5) "Join the Revolt Against the 'Feres Doctrine'!"; 6) "Blow the Whistle on the Military's Psychiatric Retaliation Against Whistleblowers!"; and 7) "Resist the Government's Drafty Spin!"  Defs.' Stmt. of Facts ¶ 5; Pl.'s Opp'n to Defs.' Stmt of Facts ¶ 5. None of Plaintiff's submissions were published by any CEN.  Defs.' Stmt. of Facts ¶ 6; Pl.'s Opp'n to Defs.' Stmt. of  Facts ¶ 6.  Plaintiff characterizes these submissions as "paid advertisements."  Pl.'s Stmt. of Facts ¶ 3.  The contents of two of these seven "paid advertisements" (all of which the Court finds to be similar in tone) are set forth in full as follows:

> [1] BLOW THE WHISTLE ON BUSH'S "GULF OF PERSIA" RESOLUTION! History shows that presidential lying constitutes an impeachable offense.  If Bush has lied to the world about his No. 1 reason for waging war against Iraq, then he should be impeached.  If enough whistleblowers on this issue decide to come forward, their evidence may be enough to guarantee that impeachment.  And if you happen to be (or know someone who is) one of those Deep Throats, please make yourself known to Larry W. Bryant at: 3518 Martha Custis Drive, Alexandria, VA 22302; phone: 703-931-3341; e-mail overtci@cavtel.net.  Armed with your evidence ("leaked" or otherwise), we can begin establishing a whistleblower reward fund toward achieving Pres. Bush's full accountability as to what he knew (and when he knew it) about the veracity of his statements and acts.  (And since our defense officials affirm the efficacy of polygraph testing for their employees, let's demand that Bush undergo a lie-detector test on this issue!)

---

with respect to said Consent Judgment, as well as the lack of legal basis or context in which to apply its contents to the instant case, the Court shall not consider said Judgment in rendering its decision.

> [2] Blow the Whistle on Iraqnam's Battle-of-Baghdad Cover-Up!
> A group of current/former U.S. servicemembers–known as the Ghost Troop
> http://geocities.com/onlythecaptain/)–has found the 'bloody knife' exposing the
> OFFICIALLY UNRELEASED number of Americans who died during the fierce battle at
> Iraq's capital in the spring of 2003.  That number, of course, dwarfs the officially released
> count.  To help determine the discrepancy's cause/perpetuators/accountability, the group
> is seeking all related documentary evidence and sworn testimony from all BOBCUP
> whistleblowers brave enough to come forward.  Armed with your accounts, the group can
> persuade Congress to exercise its oversight authority in this matter.  Contact: Larry W.
> Bryant at: 703-931-3341 (e-mail: overtCI@cavtel.net).

1st Compl. ¶ 7; 2nd Compl. ¶¶ 11-17.  *See also* Pl.'s Stmt. of Facts ¶¶ 4, 8; Defs.' Opp'n to Pl.'s

Stmt. of Facts ¶¶ 4, 8.  After Plaintiff submitted these "advertisements," he received numerous

replies from military personnel rejecting his submissions.  Pl.'s Stmt. of Facts ¶ 15.

On August 5, 2005, Defendants filed a [21/18][4] Stipulation that "[f]or purposes of the

liability phase of this litigation, Defendant will stipulate that the only legal basis on which

Defendants will contend that Plaintiff's submissions were unacceptable for publication

(assuming submission of a proper request) is Department of Defense Instruction ("DODI")

5120.4 and its implementing regulations.  For purposes of any issue relating to damages,

Defendants do not concede either that Plaintiff followed the applicable procedures or regulations

for requesting publication or that Plaintiff requested publication in all of the instances alleged in

the complaints." [21/18] Stipulation at 1.

The current DODI 5120.4, effective June 16, 1997, is entitled *Department of Defense*

*Newspapers, Magazines and Civilian Enterprise Publications*.  Defs.' Mem. to Dismiss or for

Summ. J. at 11 n.4 & Ex. 1.  Defining CENs, DODI 5120.4, E2.1.2.1 states:

---

[4]  Where the Court provides docket numbers in the following
format–[(number)/(number)]–the first number corresponds with the docket entry number in Civ.
No. 04–1125, whereas the second number corresponds with the docket entry number in Civ. No.
05-64.

> CE Newspapers.  Newspapers published by commercial publishers under contract with the DoD Components or their subordinate commands.  The commander or public affairs office provides oversight and final approval authority for the news and editorial content of the paper.  Authorized news and information sources include the Office of the Assistant Secretary of Defense for Public Affairs (OASD(PA)), AFIS, the Military Departments, their subordinate levels of command, and other Government Agencies.  CE contractor personnel may provide material for use in the newspaper if approved by the commander or public affairs officer (PAO), as the commander's representative.  These newspapers contain advertising sold by the commercial publisher on the same basis as for CE guides and installation maps and may contain supplements or inserts.  They become the property of the command, installation, or intended recipient upon delivery in accordance with terms of the contract.

DODI 5120.4, E2.1.2.1.  CENs are "mission activities," DODI 5120.4 § 6.2.3, that are intended to "provide the commander a primary means of communicating mission-essential information to the members of the command.  They provide feedback through such forums as letters to the editor columns.  This alerts the commander to the emotional status and state of DoD knowledge of the command.  The newspaper is used as a return conduit for command information to improve attitudes and increase knowledge."  DODI 5120.4 § 6.2.1.1.1.  "The newspaper exists to facilitate accomplishment of the command or installation mission.  That is the only basis for the expenditure of DoD resources to produce them."  DODI 5120.4 § 6.2.1.1.8.  Furthermore,

> The newspaper improves morale by quelling rumors and keeping members informed on DoD information that will affect their futures.  It provides information and assistance to family members, which improve their spirits and thereby the effectiveness of their military service and/or civilian member.  The newspaper encourages participation in various positive leisure-time activities to improve morale and deter alcohol abuse and other pursuits that impair their ability to perform.

DODI 5120.4 § 6.2.1.1.3.

CENs include advertisements.  Such advertisements "guide command members to outlets where they may fulfill their purchasing needs.  A by-product of this commercial contact is

increased installation-community communication, which enhances mutual support." DODI

5120.4 § 6.2.1.1.5. "CE publishers sell advertising to cover costs and secure earnings . . . ."

DODI 5120.4, E4.1.1.

DODI 5120.4 and its enclosures and attachments limit the content to be included in CENs

generally and in the advertisement portions thereof specifically. Pursuant to DODI 5120.4 § 4.11

> DoD publications shall not contain campaign news, partisan discussions, cartoons,
> editorials, or commentaries dealing with political campaigns, candidates, issues, or which
> advocate lobbying elected officials on specific issues. DoD CE publications shall not
> carry paid political advertisements for a candidate, party, which advocate a particular
> position on a political issue, or which advocate lobbying elected officials on a specific
> issue. This includes those advertisements advocating a position on any proposed DoD
> policy or policy under review.

DODI 5120.4 § 4.11. The following guidelines apply to advertisements in CE publications in

particular:

> E4.1.7.3. Before each issue of a CE publication is printed, the public affairs staff
> shall review advertisements to identify any that are contrary to law or to DoD or Military
> Service regulations, including this Instruction, or that may pose a danger or detriment to
> DoD personnel or their family members, or that interfere with the command or
> installation missions. It is in the command's best interest to carefully apply DoD and
> Service regulations and request exclusion of only those advertisements that are clearly in
> violation of this Instruction. If any such advertisements are identified, the public affairs
> office shall obtain a legal coordination of the proposed exclusion. After coordination, the
> public affairs office shall request, in writing if necessary, that the commercial publisher
> delete any such advertisements. If the publisher prints the issue containing the
> objectionable advertisement(s), the commander may prohibit distribution in accordance
> with DoD Directive 1325.6 (reference (u)).

> E4.1.7.4. Reference (u) gives the commander authority to prohibit distribution on
> the installation of a CE publication containing advertising he or she determines likely to
> promote a situation leading to potential riots or other disturbances, or when the
> circulation of such advertising may present a danger to loyalty, discipline, or morale of
> personnel. Each commander shall determine whether particular advertisements to be
> placed by the publisher in a CE publication serving the command or installation may
> interfere with successful mission performance. . . .

DODI 5120.4, E4.1.7.3 & E4.1.7.4.

## II.  LEGAL STANDARD

    *A.        Motion to Dismiss–Rule 12(b)(6)*

    In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, unlike resolving a motion under Rule 12(b)(1), the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations.  *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged.").  While the court must construe the Complaint in the Plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are not supported by the facts set out in the complaint." *Kowal*, 16 F.3d at 1276.  Moreover, the court is not bound to accept the legal conclusions of the non-moving party.  *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997).  The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record.  *See St. Francis Xavier Sch.*, 117 F.3d at 624; *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).  Factual allegations in briefs of memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint.  *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994); *cf. Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

B.    *Motion for Summary Judgment*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, the moving party, bears the "initial

responsibility of informing the district court of the basis for [its] motion, and identifying those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'"  *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91

L. Ed. 2d 202 (1986).  To be material, the factual assertion must be capable of affecting the

substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient

admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at

251, 106 S. Ct. 2505 (the court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative,

summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S. Ct. 2505

(internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment." *Williams v.*

*Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply

"show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Instead,

while the movant bears the initial responsibility of identifying those portions of the record that

demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant

to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587,

106 S. Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III.  DISCUSSION

The Court shall address the various claims raised by Plaintiff in his Complaints (as

further articulated in his Motion for Summary Judgment) in turn:

*A.      Plaintiff's First Amendment Claims*

In his Complaints, Plaintiff argues that various Defense Department

Guidelines–specifically, DODI 5120.4, E4.1.7.3 and § 4.11–are "unconstitutional on their face."

2nd Compl. ¶¶ 9, 10, 21.  *See also* 1st Compl. ¶ 13.  Plaintiff also argues that "DDI No. 5120.4 is

unconstitutional . . . as applied to Plaintiff's paid Advertisements" by violating, in part, his First

Amendment rights "to free expression and freedom of the press."  2nd Compl. ¶¶ 10, 20, 21.  *See*

1st Compl. ¶¶ 12, 13.  Plaintiff more "specifically" delineates his claims in his summary

judgment motion, stating that these provisions "are unconstitutionally vague and overbroad in

their language," in addition to "giv[ing] unconstitutionally unbridled discretion to those who

administer said regulations," and "amount[ing] to unconstitutional content-based restrictions on speech."  Pl.'s Mem. for Summ. J. at 4.  In fact, the *entirety* of Plaintiff's argument in his memorandum supporting his summary judgment motion is as follows:

> Where, as here, these CEN's [sic] invite advertising, the Constitution does not permit the continuation of some sort of military exception from the First Amendment. *Flower v. U.S.*, 407 U.S. 197-99 (1972) (where a military base makes itself fully accessible to the public, it cannot restrict civilian's leafleting on such parts of the base). *See also ACLU v. Mineta*, 319 F. Supp. 2d 69, 86-87 (D.D.C. 2004).  Moreover, by the CEN's [sic] opening themselves to advertising by the general public, even if the public forum doctrine applies, the CEN's [sic] are public forums for purposes of this litigation, where the CEN's [sic] and the military fully opened the CEN's [sic] to advertising from the public at large.  *Id.* at 80-81 (addressing the distinction, for First Amendment analysis, among the traditional public fora, the designated public forum, and nonpublic fora).  Moreover, First Amendment rights in these CEN's [sic] increases when considering how unobtrusive is the advertising activity that Defendants prevented Plaintiff from engaging in.  *Lee v. Int'l Soc. of Krishna Consciousness*, 505 U.S. 830 (1992); *Int'l Soc. of Krishna Consciousness v. Lee*, 505 U.S. 672 (1992) (the first case provides Constitutional rights to hand out leaflets in a bus port authority; the latter case upholds a ban on proselytizing at airports. ; [sic]

Pl.'s Mem. for Summ. J. at 4.

The Court agrees with Defendant's observation that Plaintiff's arguments–posed in single sentences–are fatally underdeveloped.  *See United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).");

*Cooper v. First Gov't Mortgage & Investors Corp.*, 238 F. Supp. 2d 50, 62 (D.D.C. 2002) (rejecting undeveloped argument in summary judgment motion).  However, in the alternative, the Court will address the merits of Plaintiff's claims, dismissing said claims pursuant to Federal Rule of Civil Procedure 56.

1.     CENs, including their advertising sections, are not public fora

10

Assuming without deciding that Plaintiff's submissions may be construed as Plaintiff has framed them–as "paid advertisements"–the Court holds that CENs, including the advertising sections located therein–are non-public fora.

The Court could rest, at least in part, on the principle of collateral estoppel in making this determination:

> The federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel. Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. As this Court and other courts have often recognized, res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.

*Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 414-15, 66 L. Ed. 2d 308 (1980) (internal citations and footnotes omitted). In *Bryant v. Secretary of the Army*, a different case previously brought by Plaintiff against the Secretary of the Army, the Court held that "the Court finds that the Civilian Enterprise Newspapers at issue in this case are not public fora, and that the content-based restrictions embodied in the governing regulations are eminently reasonable in light of the purposes for which these newspapers were intended. The Court thus finds no merit to the Plaintiff's First Amendment claims that the Army regulation in question implicates impermissible content-based restrictions, either facially or as applied." *Bryant*, 862 F. Supp. at 576. Plaintiff contested the constitutionality of Army Regulation 360-81, which implements DODI 5120.4. *Id.* at 577. Plaintiff classified his submissions to CENs in *Bryant* as "Letters to the Editor" such that the Court also explicitly held that the "Letters to the Editor" feature of various CENs were also non-public fora. *Id.* at 581. "Notwithstanding the Plaintiff's claims to

the contrary, . . . the Court cannot conclude that the Government intended to create a 'limited'

public forum in establishing CENs–nor even in its decision to include a 'letters to the editor'

feature. . . .  In the instant case, the principal function of the CENs is to further the objectives of

the command installation, and the use of the CE Newspaper format is merely a reflection of the

fact that CE Newspapers are a more economical means to support CI objectives." *Id.* at 582

(internal quotation omitted).  Accordingly, the Court's reliance on this prior determination by the

United States District Court for the District of Columbia that CENs are non-public fora would

comport with principles of collateral estoppel with respect to the instant Defendants given that

this issue was raised, briefed, and finally decided by a court in this prior action.

However, even assessing *de novo* what forum classification should be ascribed to CENs,

the Court holds that CENs are unequivocally non-public fora.[5]  Pursuant to the First Amendment,

---

[5] The Court notes that a line of cases not cited by either party suggests that the Court should decline to apply forum analysis to what arguably constitutes editorial judgments "in deciding what private speech to make available to the public." *United States v. Am. Library Ass'n*, 539 U.S. 194, 204, 123 S. Ct. 2297, 2304, 156 L. Ed. 2d 221 (2003).  In *Arkansas Educational Television Commission v. Forbes*, the Supreme Court, after determining that "the public forum doctrine should not be extended in a mechanical way to the very different context of public television broadcasting," held that "in most cases, the First Amendment of its own force does not compel public broadcasters to allow third parties access to their programming." 523 U.S. 666, 672-73, 675, 118 S. Ct. 1633, 1639, 1640, 140 L. Ed. 2d 875 (1998).  *See also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 118 S. Ct. 2168, 141 L. Ed. 2d 500 (1998).  In *American Library*, a plurality of the Court reasoned that forum analysis is incompatible "with the discretion that public libraries must have to fulfill their traditional missions.  Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them." *Am.Library*, 539 U.S. at 205, 123 S. Ct. 2297.

This Court finds the plurality's reasoning in *American Library* applicable at first glance to analogous aspects of the instant cases.  In *American Library*, the plurality stated that "[a] public library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves, any more than it collects books in order to provide a public forum for the authors of the books to speak.  It provides Internet access . . . to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." 539 U.S. at 206, 123 S. Ct. 2297.  In comparison, CENs do not acquire advertising or designate space

"Congress shall make no law respecting an establishment of religion, or prohibiting the free

exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people

peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const.

amend I.  No party in the instant cases refutes that Plaintiff's submissions constitute a form of

political speech protected under the First Amendment.[6]  However, "it is also well settled that the

_____

therefor in order to create a public forum for such advertisers to express themselves.  CENs are
created using military funds for the stated purpose of "facilitat[ing] accomplishment of the
command or installation mission[, which] is the only basis for the expenditure of DoD resources
to produce them[,]" DODI 5120.4 § 6.2.1.1.8, and advertisements are specifically intended to
further that purpose by "guid[ing] command members to outlets where they may fulfill their
purchasing needs" and "cover[ing] costs and secur[ing] earnings . . . ." DODI 5120.4, E4.1.1.
        Ultimately, however, the aforementioned line of cases rests on the idea of "public
speech"–the principle that when a public entity "exercises editorial discretion in the selection and
presentation of its programming [or library collection, or art exhibit], it engages in speech
activity." *Forbes*, 523 U.S. at 674, 118 S. Ct. 1633.  *See also People for the Ethical Treatment of
Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (describing a public commission's
selection of which models to include in a public art exhibition as government speech).  "In many
instances it is quite clear that the government is not regulating private speech.  The government
may produce films and publications.  It may run museums, libraries, television and radio stations,
primary and secondary schools, and universities.  In all such activities, the government engages
in the type of viewpoint discrimination that would be unconstitutional if it were acting as a
regulator of private speech." *Id.* at 29.  Unlike the decisions presented in the above-cited cases,
the military does not actively choose advertisements according to the kind of subjective and
selective criteria that accompany the establishment of a government-funded art exhibit or even
the creation of a library collection.  Furthermore, the Court in *Bryant* rejected the Government's
argument that CENs constitute government speech, and this decision applies in the instant cases
pursuant to principle of collateral estoppel.  *See Bryant*, 862 F. Supp. at 580.  In light of the
above, and considering that neither Plaintiff nor Defendants have construed the CENs or their
advertising sections as "public speech" here, the Court shall not independently apply this doctrine
to the cases at hand.

        [6]  The Court notes that despite Plaintiff's characterization of his submissions as "paid
advertisements," his submissions do not constitute commercial speech.  "Commercial speech" is
defined as "expression related solely to the economic interests of the speaker and its audience."
*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 561, 100
S. Ct. 2343, 2349, 65 L. Ed. 2d 341 (1980).  Plaintiff's submissions do not appear to reflect any
economic interest, let alone a singular economic intent, by Plaintiff.  However, as "[t]he
Constitution [] accords a lesser protection to commercial speech than to other constitutionally

government need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S. Ct. 2701, 2705, 120 L. Ed. 2d 541 (1991).

The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800, 105 S. Ct. 3439, 3448, 87 L. Ed. 2d 567 (1985). Pursuant to the Supreme Court's forum analysis, three types of fora exist:  traditional public fora, designated or limited public fora, and non-public fora.  *Forbes*, 523 U.S. at 677, 118 S. Ct. 1633; *Cornelius*, 473 U.S. at 802, 105 S. Ct. 3439.  Traditional public fora "are defined by the objective characteristics of the property, such as whether, 'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate.'" *Forbes*, 523 U.S. at 677 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 954, 74 L. Ed. 2d 794 (1983)).  Such fora include public streets, sidewalks, and parks.  *Cornelius*, 473 U.S. at 802, 105 S. Ct. 3439; *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1305 (D.C. Cir. 2005).

If the Court determines that a traditional public forum does not exist, the principles applied to such fora may still be invoked if the Court determines that a designated or limited public forum has nonetheless been created by the government.  "In addition to traditional public fora, a public forum may be created by government designation of a place or channel of

--------

guaranteed expression[,]" the Court is in fact applying a more restrictive standard to Defendants' conduct than it would under the commercial speech doctrine.

14

communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802, 105 S. Ct. 3439. *See also Perry Educ. Ass'n,* 460 U.S. at 46, n.7, 103 S. Ct. 948 ("A public forum may be *created* for a limited purpose such as use by certain groups, or for the discussion of certain subjects") (emphasis added, internal citations omitted). "The touchstone for determining whether government property is a designated public forum is the government's intent in establishing and maintaining the property." *Stewart v. District of Columbia Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1988). In determining whether a forum is appropriately defined as a designated public forum or a non-public forum, "[t]he Court has [] examined the nature of the property and its compatibility with expressive activity to discern the government's intent" as to whether the government intended to create a designated public forum. *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1390 (D.C. Cir. 1990) (quoting *Cornelius*, 473 U.S. at 802, 105 S. Ct. 3439). *See also Stewart*, 863 F.2d at 1017 (describing the "*Cornelius* factors" as "the character of the forum in the nature of the property, its compatibility with expressive activity, and the *consistent* policy and practice of the government."). The decision to create a public forum must be made "by intentionally opening a nontraditional forum for public discourse." *Krishna*, 505 U.S. at 680, 112. S. Ct. 2701.

However, "[n]ot every instrumentality used for communication . . . is a traditional public forum or a public forum by designation. . . . We will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Cornelius*, 473 U.S. at 803, 105 S. Ct. 3439 (internal citations omitted). "On one

hand, the government creates a designated public forum when it makes its property generally available to a certain class of speakers, as the university made its facilities generally available to student groups in *Widmar.* On the other hand, the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission,' 473 U.S., at 804, 105 S. Ct., at 3450, to use it." *Forbes*, 523 U.S. at 679, 118 S. Ct. 1633. "[T]he Court has refused to find a designated public forum where there is clear evidence of contrary intent or the nature of the regulated property is inconsistent with free speech activity." *Cmty. for Creative Non-Violence,* 893 F.2d at 1391. Furthermore, "the government does not create a public forum by inaction. Nor is a public forum created 'whenever members of the public are permitted freely to visit a place owned or operated by the Government.'" *Krishna*, 505 U.S. at 680, 112. S. Ct. 2701. The Supreme Court has held, for example, that military reservations (generally), jailhouse grounds, airport terminals, an inter-school mail system, car card space on a public transit system, and the Combined Federal Campaign all constitute non-public fora. *See Krishna*, 505 U.S. at 679,112 S. Ct. 2701; *Cornelius*, 473 U.S. at 804, 105 S. Ct. 3439; *Perry Educ. Ass'n*, 460 U.S. at 47-48, 103 S. Ct. 948; and *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S. Ct. 2714, 2718, 41 L. Ed. 2d 770 (1974) (plurality opinion). With respect to airport terminals, the Supreme Court reasoned that "it cannot fairly be said that an airport terminal has as a principal purpose promoting the free exchange of ideas. To the contrary, the record demonstrates that Port Authority management considers the purpose of the terminals to be the facilitation of passenger air travel, not the promotion of expression." *Krishna*, 505 U.S. at 682 (internal citations and quotations omitted).

16

Different levels of scrutiny apply to the various forum types. "[T]he extent to which the Government can control access depends on the nature of the relevant forum." *Cornelius*, 473 U.S. at 800, 105 S. Ct. 3439. "Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* In a public forum, "[t]he state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S. Ct. 948. Designated public fora are typically subject to the same level of control as traditional public fora. *See Initiative & Referendum Inst.*, 417 F.3d at 1306. "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." *Forbes*, 523 U.S. at 677, 118 S. Ct. 1633.[7] Regulations regarding designated public fora must also be content-

---

[7] In *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 215 F. Supp. 2d 120, 129 (D.D.C. 2002), the district court noted that "[r]ecently, the Court in *Good News Club v. Milford Central School*, 533 U.S. 98, 107, 121 S. Ct. 2093 (2001), citing *Rosenberger*, also applied the 'reasonableness' standard to restrictions on limited public forums, as opposed to the strict scrutiny standard of *Perry*." *Id.* "The Court . . . believes that the 'reasonableness' standard of review applied in *Good News* and *Rosenberger* is the proper standard for evaluation restrictions on speech in limited public forums." *Id.* at 130-131. The district court parsed the second forum category into two subcategories–the unlimited designated public forum, defined as "public property that is not traditionally used for expressive activity, but has been opened by all to the state for public discourse; and the limited public forum, "a narrower category [that] can be restricted to certain groups or to the discussion of certain topics." *id.* at 129 (internal citations and quotations omitted)–and deemed strict scrutiny appropriately applied to the former, and the reasonableness standard applicable to the latter. *Id.* at 130-131. *See also Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829, 115 S. Ct. 2510, 2517, 132 L. Ed. 2d 700 (1995) ("Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum.") (internal quotations and citation

neutral.  However, a challenged regulation applicable to a non-public forum need only be

reasonable and viewpoint neutral.  *Krishna*, 505 U.S. at 679, 112. S. Ct. 2701.

Applying this framework to the regulations at issue, the Court first takes note of the

military application of these guidelines.  "Our review of military regulations challenged on First

Amendment grounds is far more deferential than constitutional review of similar laws or

regulations designed for civilian society.  The military need not encourage debate or tolerate

protest to the extent that such tolerance is required of the civilian state by the First Amendment;

to accomplish its mission the military must foster instinctive obedience, unity, commitment, and

esprit de corps."  *Goldman v. Weinberger*, 475 U.S. 503, 507, 106 S. Ct. 1310, 1313, 89 L. Ed.

2d 478 (1986).  "While the members of the military are not excluded from the protection granted

by the First Amendment, the different character of the military community and of the military

mission requires a different application of those protections.  The fundamental necessity for

obedience, and the consequent necessity for imposition of discipline, may render permissible

within the military that which would be constitutionally impermissible outside it.  Doctrines of

First Amendment overbreadth asserted in support of challenges to imprecise language . . . are not

exempt from the operation of these principles."  *Parker v. Levy*, 417 U.S. 733, 758, 94 S. Ct.

2547, 2563, 41 L. Ed. 2d 439 (1974).

Applying the forum analysis detailed above and considering the deference afforded to

military regulations, the Court concludes that CENs are properly characterized as non-public

_____

omitted); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07, 121 S. Ct. 2093, 2100,
150 L. Ed. 2d 151 (2001) (quoting *Rosenberger*).

    The Court need not opine on the question of what standard applies to "limited public
fora" as defined in *Gittens*, however, as CENs, including the advertising sections therein, are
non-public fora such that the reasonableness standard applies regardless.

fora.  As previously stated, "[t]he touchstone for determining whether government property is a designated public forum is the government's intent in establishing and maintaining the property." *Stewart v. District of Columbia Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1988).  In these cases, the "government's intent in establishing and maintaining" CENs *and* more specifically their advertising sections is clearly delineated in DODI 5120.4 and its corresponding regulations. CENs are considered to be "mission activities," DODI 5120.4 § 6.2.3, that are intended to "provide the commander a primary means of communicating mission-essential information to the members of the command."  DODI 5120.4 § 6.2.1.1.1.  The "only basis" for the expenditure of Department of Defense resources on them–and thus for their existence–is to "facilitate accomplishment of the command or installation mission."  DODI 5120.4 § 6.2.1.1.8.  The stated purpose of advertisements in CENs is to "guide command members to outlets where they may fulfill their purchasing needs," DODI 5120.4 § 6.2.1.1.5, and to "cover costs and secure earnings," DODI 5120.4, E4.1.1.  Such guidelines do not evince any intent, nor do they comport with the goal, of fostering unrestrained "communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802, 105 S. Ct. 3439.  Furthermore, the nature of CENs, as military-funded publications circulated on base designed for "improving morale" "quelling rumors" " keeping members informed on DoD information that will affect their futures" and "providing information and assistance to family members," DODI 5120.4 § 6.2.1.1.3, is inconsistent with the free exchange of ideas.  "We will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity."

*Cornelius*, 473 U.S. at 803, 105 S. Ct. 3439 (internal citations omitted).

Plaintiff attempts to make a distinction between the advertising section of CENs and the CENs themselves, stating that "the 1994 *Bryant* case never addressed the extent to which the advertising pages of CENs are public fora, seeing that the 1994 *Bryant* case only dealt with reject[ing] letters to the editor, whereas the current litigation deals with paid advertising."  Pl.'s Opp'n at 1.  However, Plaintiff does not support the alleged distinction he creates with any case law, merely stating that "[t]his is not situation [sic] where the military has an interest in shielding its members [sic] having to see an anti-war demonstration as they walk to the mess hall.  A paid ad in a CEN involves no captive audience in that the paid ad disappears from site [sic] upon the turning of the page or the closing of the newspaper."  *Id.* at 2.  Plaintiff's "argument" is unavailing, as his "captive audience" theory would apply equally to CENs generally and their advertising sections, making no further distinction between them.  In fact, the very case he relies upon–*ACLU v. Mineta*–rests on the viewpoint-discriminatory nature of a congressional appropriation tied to WMATA's exclusion of advertising supporting the legalization of marijuana, and merely notes in passing the singular concurring opinion in *Lehman v. City of Shaker Heights* finding "no constitutional right to spread a message before 'a captive audience' on the city's buses."  *ACLU v. Mineta*, 319 F. Supp. 2d 69, 81 (D.D.C. 2004) (quoting *Lehman*, 418 U.S. at 308, 94 S. Ct. 2714 (Douglas, J., concurring)).

Of course, *ACLU v. Mineta* does not stand for the proposition that "Defendants cannot prevent the types of paid ads submitted by Plaintiff without first stopping their practice of promoting and accepting paid advertising[,]" as Plaintiff claims.  *See* Pl.'s Opp'n at 2.  Spaces found to be non-public fora can legitimately decline political advertising as a content-based

restriction.  *See Lehman,* 418 U.S. at 304, 94 S. Ct. 2714.  Plaintiff's reliance on *Flower v. United States* is also misplaced.  *See Flower v. United States*, 407 U.S. 197, 92 S. Ct. 1842, 32 L. Ed. 2d 653 (1972).  While the Supreme Court in *Flower* held that a street which was "an important traffic artery used freely by buses, taxi cabs and other public transportation facilities as well as by private vehicles," lined by "sidewalks used extensively at all hours of the day by civilians as well as by military personnel" was a public forum on which leafleting could not constitute a federal criminal offense without violating the First Amendment," *id.* at 198, 92 S. Ct. 1842, "[t]he decision in Flower was [] based upon the Court's understanding that New Braunfels Avenue was a public thoroughfare in San Antonio no different from all the other public thoroughfares in that city . . . ."  *Greer v. Spock*, 424 U.S. 828, 835, 96 S. Ct. 1211, 1216, 47 L. Ed. 2d 505 (1976).  *See also Flower*, 407 U.S. at 198, 92 S. Ct. 1842 ("Under such circumstances the military has abandoned any claim that it has special interests in who walks, talks, or distributes leaflets on the avenue."); *United States v. Albertini*, 472 U.S. 675, 685-86, 105 S. Ct. 2897, 2905, 86 L. Ed. 2d 536 (1985) ("*Flower* establishes that where a portion of a military base constitutes a public forum because the military has abandoned any right to exclude civilian traffic and any claim of special interest in regulating expression, see *Greer v. Spock, supra,* 424 U.S., at 836-838, 96 S. Ct., at 1216-1218, a person may not be excluded from that area on the basis of activity that is itself protected by the First Amendment.").  In contrast, the government cannot be said to have "abandoned any claim that it has special interests" with respect to either CENs or their advertising sections in light of DODI 5120.4 and its implementing guidelines with respect to the narrow and defined purpose of CENs generally and their advertising sections in particular.

Furthermore, the Court finds *Cornelius* instructive with respect to CENs and their

advertising sections.  In *Cornelius*, the Supreme Court determined that the Combined Federal

Campaign (CFC), which it held to be a non-public forum, was the relevant forum as opposed to

the federal workplace:  "In cases in which limited access is sought, our cases have taken a more

tailored approach to ascertaining the perimeters of a forum within the confines of the government

property."  *Cornelius*, 473 U.S. at 801, 105 S. Ct. 3439.  Even if the Court were to conclude the

appropriate forum in the instant case is not the CEN as a whole (which in and of itself is a

relevant forum within the military base in which it is circulated) but the advertising section in

particular, the Supreme Court instructs consideration of the circumstances of the larger forum.

"Consistent with the approach taken in prior cases, we find that the CFC, rather than the federal

workplace, is the forum.  This conclusion does not mean, however, that the Court will ignore the

special nature and function of the federal workplace in evaluating the limits that may be imposed

on an organization's right to participate in the CFC."  *Cornelius*, 473 U.S. at 801-802, 105 S. Ct.

3439 (citing *Perry Educ. Ass'n,* 460 U.S. at 44, 103 S. Ct. 948).  In the cases before this Court,

the "special nature" and "function" of the military inform the Court's consideration of the

military bases served by the CENs in question.  Furthermore, in *Cornelius*, the Court noted that

the history of the CFC does not "support a finding that the Government was motivated by an

affirmative desire to provide an open forum for charitable solicitation in the federal workplace

when it began the Campaign."  *Cornelius*, 473 U.S. at 805, 105 S. Ct. 3439.  Similarly, DODI

5120.4 and its implementing guidelines demonstrate that CENs were not intended to provide an

open forum for advertising.

     In sum, the Court concludes that both CENs and their advertising sections are non-public

fora.  The Court shall proceed to apply the appropriate reasonableness standard to regulations

with respect thereto in addressing what it construes to be Plaintiff's facial and as-applied

challenges.

          2.      <u>DODI 5120.4, E4.1.7.3 and § 4.11 are reasonable on their face</u>

              *a.*     *DODI 5120.4, E4.1.7.3 and § 4.11 are reasonable in light of CENs' purpose*

In non-public fora, the standard for exclusion is "reasonableness" rather than strict

scrutiny. Defs.' Opp'n at 16. *See also Gittens*, 215 F. Supp. 2d at 130-31; *Bryant*, 862 F. Supp.

at 578, 583. A restriction in a public forum "need only be reasonable; it need not be the most

reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808, 105 S. Ct. 3439.

Furthermore, the Court notes that an analysis of whether the guidelines at issue are reasonable

may consider their function as internal military controls:

> Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject. *Kokinda, supra,* 497 U.S., at 725, 110 S. Ct., at 3119 (plurality opinion) (citing *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 896, 81 S. Ct. 1743, 1749, 6 L. Ed. 2d 1230 (1961)). Thus, we have upheld a ban on political advertisements in city-operated transit vehicles, *Lehman v. Shaker Heights,* 418 U.S. 298, 94 S. Ct. 2714, 41 L. Ed. 2d 770 (1974), even though the city permitted other types of advertising on those vehicles. Similarly, we have permitted a school district to limit access to an internal mail system used to communicate with teachers employed by the district. *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983).

*Krishna*, 505 U.S. at 678, 112 S. Ct. 2701.

The Court holds that DODI 5120.4, E4.1.7.3 and § 4.11 are viewpoint-neutral operational

guidelines which are permissible in a non-public forum. "A speaker may be excluded from a

nonpublic forum if he wishes to address a topic not encompassed within the purpose of the

forum." *Cornelius*, 473 U.S. at 806, 105 S. Ct. 3439, *quoted in Bryant*, 862 F. Supp. at 583 ("In

the instant case, the Court finds that the purpose of the CE Newspapers is indeed to 'facilitate the

accomplishment of the command or installation mission.'  As such, regulations that permit the

Army to limit publication of letters to materials that are '*pertinent* and *relevant* to the command'

and that are not '[p]olitical ... or ... *partisan in nature*' are eminently reasonable restrictions, well

in keeping with the strictures of the First Amendment.").  *See also Bryant*, 862 F. Supp. at 584

("considerations as to whether submissions are 'pertinent, relevant, partisan, political, or

facilitate the accomplishment of the command or installation mission' are all appropriate

inquiries and are properly committed to the discretion' of the army's editorial staff.").

Plaintiff claims that DODI 5120.4, E4.1.7.3 and § 4.11 "amount to unconstitutional

content-based restrictions on speech," Pl.'s Mem. for Summ. J. at 4.  But content-based

restrictions on speech are permitted in non-public fora such as CENs.  For example, in *Greer v.

Spock*, the Supreme Court held that a military regulation prohibiting speech by political

candidates on a military base did not run afoul of the Constitution.  *Greer*, 424 U.S. at 839, 96 S.

Ct. 1211.  Stating that "it is consequently the business of a military installation . . . to train

soldiers, not to provide a public forum," *id.* at 838, the Court reversed the appellate court ruling

that Fort Dix Regulation 210-26, which provided that "[d]emonstrations, picketing, sit-ins,

protest marches, political speeches and similar activities are prohibited and will not be conducted

on the Fort Dix Military Reservation," violated the First Amendment.  *Id.* at 831, 96 S. Ct. 1211.

"[T]he military as such is insulated from both the reality and the appearance of acting as a

handmaiden for partisan political causes or candidates."  *Id.* at 839, 96 S. Ct. 1211.  While

another regulation, Fort Dix Reg. 210-27, prohibited the circulation of campaign leaflets also at

issue in the case that had not been previously authorized and that a military commander found to

be "a clear danger to the loyalty, discipline, or morale of the troops on the base under his command," *id.* at 831, 840, 96 S. Ct. 1211, the Court did not find that regulation to be facially unconstitutional either and noted that the respondents had not attempted to obtain approval for distribution. *Id.* at 840, 96 S. Ct. 1211.

DODI 5120.4 § 4.11 forbids the inclusion in CENs of "campaign news, partisan discussions, cartoons, editorials, or commentaries dealing with political campaigns, candidates, issues, or which advocate lobbying elected officials on specific issues . . . paid political advertisements for a candidate, party, which advocate a particular position on a political issue, or which advocate lobbying elected officials on a specific issue." DODI 5120.4 § 4.11. The Court finds that this provision reasonably shields the military from "both the reality and the appearance of acting as a handmaiden for partisan political causes or candidates" by categorically excluding political advertisements from military-funded CENs. Importantly, these guidelines do not permit viewpoint-based exclusions (which would not be permissible) as they exclude all political advertisements, not simply those espousing a particular point of view. "The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *Cornelius*, 473 U.S. at 811, 105 S. Ct. 3439. In *Lehman v. City of Shaker Heights*, a plurality of the Court held that political advertising could be categorically excluded from advertising space on city rapid transit vehicles. 418 U.S. at 303, 94 S. Ct. 2714: "In much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles." *Id.* In the instant case, the military context of

25

CENs as publications distributed on military bases largely to military personnel provides an even stronger basis for the exclusion of political advertising, for promoting political discourse may detract from the military's unique mission of "foster[ing] instinctive obedience, unity, commitment, and esprit de corps."  *Goldman v. Weinberger*, 475 U.S. 503, 507, 106 S. Ct. 1310, 1313, 89 L. Ed. 2d 478 (1986).

In addition, the only portion of 1994 *Bryant* decision in which the court found in favor of Plaintiff was with respect to a later-deleted sentence in an army regulation–AR 360-81–that then contained a provision which the Court found was not viewpoint neutral with respect to letter to the editor submissions ("Commentaries and editorials may not extend to material not in consonance with policies of the Department of the Army.").  It is clear that any argument that Plaintiff attempts to make that Judge Richey's actual Order was violated in the instant cases carries no weight in light of the viewpoint-neutral nature of the political content prohibitions at issue.

> b.    *DODI 5120.4, E4.1.7.3 and § 4.11 are not overbroad or vague*

Plaintiff alleges, without further explanation, that the guidelines at issue are both overbroad and vague.  The Court notes that while sometimes treated as a single defect, unconstitutional overbreadth and vagueness are in fact two separate doctrines.

"What has come to be known as the First Amendment overbreadth doctrine . . . is predicated on the sensitive nature of protected expression: persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression.  It is for this reason that we have allowed persons to attack overly broad statutes even though the conduct of the person

making the attack is clearly unprotected and could be proscribed by a law drawn with the

requisite specificity." *New York v. Ferber*, 458 U.S. 747, 768-769, 102 S. Ct. 3348, 3361, 73 L.

Ed. 2d 1113 (1982) (internal quotations and citations omitted).  "The scope of the First

Amendment overbreadth doctrine, like most exceptions to established principles, must be

carefully tied to the circumstances in which facial invalidation of a statute is truly warranted."

*Id.* at 769, 102 S. Ct. 3348.  A regulation is not substantially overbroad "unless it reaches a

substantial number of impermissible applications."  *Id.* at 747, 102 S. Ct. 3348.  A facial

challenge to a law or regulation brought under the First Amendment may succeed on grounds of

overbreadth via "[a] showing that a law punishes a substantial amount of protected free speech,

judged in relation to the statute's plainly legitimate sweep, [which] suffices to invalidate *all*

enforcement of that law."  *Initiative & Referendum Inst.*, 417 F.3d at 1312 (internal quotation and

citation omitted).

　　In this case, the regulations at issue prohibit political advertising in CENs.  The Court

finds that political advertising can categorically be excluded from CENs without violating the

First Amendment.  Plaintiff does not appear to contest the sweep of said regulations to areas

beyond political speech.  Accordingly, Plaintiff has not launched any real challenge of

"overbreadth" for the Court to consider.

　　In making the separate assessment of whether a regulation is impermissibly vague, a

Court must consider the purpose of the regulation and whether it "clearly and precisely delineates

its reach in words of common understanding."  *Cameron v. Johnson*, 390 U.S. 611, 616, 88 S.

Ct. 1335, 1338, 20 L. Ed. 2d 182 (1968).  Plaintiff argues that "[e]ven assuming, *arguendo*, that

the CEN's [sic] are not public fora, the rejection of Plaintiff's paid ads is still unconstitutional for

having been governed by vague and overbroad regulations."  Pl.'s Reply at 5.  Plaintiff allegedly

relies on *Stewart v. District of Columbia Armory Bd.*, 789 F. Supp. 402, 406 (D.D.C. 1992), to

support this argument.  In *Stewart*, Judge Joyce Hens Green held that there was a substantial

likelihood that a regulation that signs and banners at RFK Stadium "shall pertain to the event"

and "shall not be commercial, vulgar or derogatory" was both overbroad and vague.  *Id.* at 403.

While determining that RFK Stadium qualified as a designated public forum, Judge Green

demonstrated why the regulation was likely vague as follows: "As illustration, the regulation

prohibits 'vulgar' or 'derogatory' speech, but fails entirely to define those terms.  In addition, the

regulation prohibits speech that does not 'pertain to the event,' but fails to guide anyone in

determining what speech pertains to an event and what speech does not."  *Id.* at 406.

> *Stewart* is not persuasive with respect to the instant cases because while an argument can

be made that the prohibiting terms in *Stewart* deemed likely to be too vague to pass constitutional

muster–"vulgar" "derogatory" and "pertain to the event"–are in fact less than self-evident

without further definition, DODI 5120.4's absolute prohibition on "political advertisements" is

very clear.  *See* DODI 5120.4, § 4.11 ("DoD CE publications shall not carry paid political

advertisements for a candidate, party, which advocate a particular position on a political issue, or

which advocate lobbying elected officials on a specific issue.  This includes those advertisements

advocating a position on any proposed DoD policy or policy under review.").[8]  Accordingly, the

_____

[8]  Plaintiff does not appear to point to any lack of clarity in DODI 5120.4, E4.1.7.3
("Before each issue of a CE publication is printed, the public affairs staff shall review
advertisements to identify any that are contrary to law or to DoD or Military Service regulations,
including this Instruction, or that may pose a danger or detriment to DoD personnel or their
family members, or that interfere with the command or installation missions.  It is in the
command's best interest to carefully apply DoD and Service regulations and request exclusion of
only those advertisements that are clearly in violation of this Instruction.  If any such

Court does not find the guidelines at issue to be unconstitutionally vague.

c.      *Plaintiff's unbridled discretion argument fails*

Prior restraints on speech are not unconstitutional if they contain "narrow, objective, and definite standards to guide licensing authorit[ies]." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S. Ct. 935, 938, 22 L. Ed. 2d 162 (1969). "[W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to the proper regulation of public places." *Id.* at 939, 89 S. Ct. 935. The Court notes at the outset that the general city code provision at issue in *Shuttlesworth* pertained to parade permits for use on public streets and sidewalks–traditional public fora ("The commission shall grant a written permit for such parade, procession or other public demonstration, prescribing the streets or other public ways which may be used therefor, unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused."). *Id.* at 149-50, 89 S. Ct. 935. However, the Federal Circuit noted that "[a]ll of the modern cases in which the Supreme Court has set forth the unbridled discretion doctrine have involved public fora, and no Supreme Court case has suggested that the doctrine is applicable outside the setting of a public forum. While an overbreadth challenge against an entirely unreasonable restraint will succeed regardless of how the forum is classified, we have no accepted framework to decide how an unbridled discretion challenge should be evaluated in a nonpublic forum." *Griffin v. Sec'y of Veterans Affairs*, 288

---

advertisements are identified, the public affairs office shall obtain a legal coordination of the proposed exclusion. After coordination, the public affairs office shall request, in writing if necessary, that the commercial publisher delete any such advertisements. If the publisher prints the issue containing the objectionable advertisement(s), the commander may prohibit distribution in accordance with DoD Directive 1325.6 (reference (u)).").

F.3d 1309, 1321-22 (Fed. Cir. 2002) (internal citation omitted).  "In a nonpublic forum, the government is said to operate as proprietor, not licensor."  *Id.* at 1322.

Defendants construe Plaintiff to argue that DODI 5120.4 gives unbridled discretion to a licensor in failing to provide sufficiently objective standards to apply and failing to set a time limit within which the licensing authority must act.  Defs.' Opp'n at 8-11.  Addressing the first of these arguments here, DODI 5120.4, E4.1.7.3 specifies that "the public affairs staff shall review advertisements to identify any that are contrary to law or to DoD or Military Service regulations, including this Instruction, or that may pose a danger or detriment to DoD personnel or their family members, or that interfere with the command or installation missions.  It is in the command's best interest to carefully apply DoD and Service regulations and request exclusion of only those advertisements that are clearly in violation of this Instruction."  DODI 5120.4, E4.1.7.3.  This provision specifically identifies DODI 5120.4–including the complete prohibition on political advertisements contained in DODI 5120.4, § 4.11–as providing a proper basis for requesting exclusion of specific advertisements (and ultimately allowing distribution to be prohibited by the commander if said advertisements are published therein).  These guidelines are "narrow, objective, and definite" and can hardly be said to give "unbridled discretion" to any party in the creation of CENs.  Second, the Court has already determined that CENs, including their advertising sections, are non-public fora.  *See supra* § III(A)(1).  "As a non-public fora, CENs are not required to have time limits within which they must reject or grant requests to place advertisements."  Defs.' Opp'n at 11.  *See Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1328 (Fed. Cir. 2002).  Consequently, Plaintiff's "unbridled discretion" argument fails.

     3.     <u>DODI 5120.4 was not applied to Plaintiff in an unconstitutional manner</u>

In Plaintiff's Reply brief, he argues for the first time that "Defendants have provided a pile of CEN's [sic] that amount to heavy propaganda periodicals from cover to cover, from article to advertisement."  Pl.'s Reply at 2.  Plaintiff attaches pages allegedly from the April 5, 2005 issue of the *Pentagram*, citing a news article titled "Terror War Promotes Transformation Concepts," and a notice for a book signing by former senator and veteran Bob Dole at a Quantico military base, presumably implying that Defendants have created a designated public forum such that Plaintiff's submissions cannot appropriately be rejected.  Plaintiff cites *Lebron v. WMATA*, 749 F.2d 893, 896 (D.C. Cir. 1984), in which the United States Court of Appeals for the District of Columbia deemed the exclusion of a poster critical of the Reagan administration from a subway display space unconstitutional, and presumably relies on the reasoning in the following statement: "There is no doubt that the poster at issue here conveys a political message; nor is there a question that WMATA has converted its subway stations into public fora by accepting other political advertising."  *Id.* at 896.  The Supreme Court in *Lehman* came to a different conclusion with respect to car card space on a city transit system, noting that this space was not a public forum, noting that "during the 26 years of public operation, the Shaker Heights system, pursuant to city council action, had not accepted or permitted any political or public issue advertising on its vehicles."  418 U.S. at 300-01, 94 S. Ct. 2714.

The news article and book-signing notice shall not be considered by the Court, as they are provided for the first time as attachments to Plaintiff's Reply Brief and incorporated into Plaintiff's argument for the first time there as well.  It is a well settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief.  *See Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992); *Golden Pacific Bancorp v. Clarke*,

31

837 F.2d 509, 513 (D.C. Cir. 1988).  Moreover, the D.C. Circuit has admonished litigants that it

"[w]ill not ordinarily entertain arguments inadequately briefed . . . [and] [c]onsequently . . . will

not indulge arguments raised for the first time in an appellant's reply brief."  *United States v.*

*Caicedo-Llanos*, 960 F.2d 158, 164 (D.C. Cir. 1992).  Nonetheless, neither attachment is political

in content nor endorses any particular political view, and thus their inclusion, even if considered,

would not support Plaintiff's argument.  Despite Plaintiff's unsupported claims to the contrary,

Plaintiff "has failed to produce any evidence that any of the CENs have accepted political

advertising since the ban in Department of Defense Instruction 5120.4 has been in place."  Defs.'

Reply at 2.  So distinguished from *Lebron*, CENs have not been converted to public fora.

    As stated above, in non-public fora, the applicable standard for exclusion is

"reasonableness" rather than strict scrutiny.  Defs.' Opp'n at 16.  *See also Gittens*, 215 F. Supp.

2d 120, 130-31 (D.D.C. 2002).  Plaintiff attempts to argue that application of the regulations at

issue to his submissions is unreasonable because of the "unobtrusive nature" of said

"advertisements."  *See* Pl.'s Mem. for Summ. J. at 4; Defs.' Opp'n at 18.  The Court would

hardly characterize Plaintiff's  "advertisements" at issue as "unobtrusive," considering their calls

for "leaked" "blow the whistle" evidence from military employees, the impeachment of the

President of the United States, and general political commentary, among other things.  In

addition, the Court agrees with Defendant's analysis with respect to the *Krishna* cases, in which

the United States Supreme Court upheld a regulation banning solicitation but struck down a

regulation banning leafleting at airport terminals:

>    While the Supreme Court contrasted the degree of intrusiveness between
> solicitation and leafleting, it based its decisions in the cases on the presence or absence of
> explanations for the two bans in the record.  The record contained a reasonable

> explanation for the ban on solicitation while it contained no reasonable explanation for the ban of leafleting. Id. at 690. The Court's discussion of the different characteristics of solicitation and leafleting was an attempt to further consider the reasonableness of the regulations. While intrusiveness may be one factor to consider in the reasonableness analysis, it is by no means controlling of more significant than other factors in that analysis.

Defs.' Opp'n at 19.

Plaintiff's submissions are in fact explicitly political in nature; Plaintiff does not refute this. Accordingly, the Court finds that the application of the guidelines at issue was reasonable in excluding Plaintiff's "paid advertisements."

  B.  *Plaintiff's Fifth Amendment Claims*

Plaintiff notably does not address his alleged Fifth Amendment claims anywhere in his Motion for Summary Judgment. Nor does he refute Defendants' arguments that he has not properly raised any due process claim in his Complaints. *See* Defs.' Mem. to D. or for Summ. J. at 16-20. "[A] court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)). *See also Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149 (D.D.C. 2002). The Court agrees that "plaintiff's opposition utterly fails to address defendants' arguments with regard to all but one of the claims in the Complaint, and the Court should treat defendants' motion as conceded with respect to any claim other than the rejection of his submissions as an alleged violation of his right to freedom of speech under the First Amendment." Defs.' Reply at 1. As Plaintiff does not raise any due process claim in his own motion for summary judgment, nor clearly articulates the basis for said claims in his Complaints, nor opposes Defendants' negation thereof in their Motion to Dismiss,

33

or in the Alternative, for Summary Judgment, nor can the Court construe precisely what

Plaintiff's Fifth Amendment claims would be with respect to the issues raised in these matters,[9]

the Court shall dismiss any Fifth Amendment claims purportedly raised by Plaintiff in his

Complaints pursuant to Federal Rule of Civil Procedure 12(b)(6).[10]

C.    *Plaintiff's Request for Injunctive Relief*

In Plaintiff's Complaints, he requests injunctive as well as declaratory relief to "enjoin

---

[9]  Plaintiff clearly has not demonstrated how either a liberty or property interest is implicated in his Complaints and accordingly has not raised a genuine due process issue. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 901, 47 L. Ed. 2d 18 (1976). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-570, 92 S. Ct. 2701, 2705, 33 L. Ed. 2d 548 (1972). *See also* Defs.' Mem. for Summ. J. at 17.

[10]  Accordingly, the Court need not address Plaintiff's own failure to adhere to requisite procedures in conveying his submissions to the military on numerous occasions. *See* Defs.' Mot. for Summ. J., Ex. 2 Tr. 43:10-13 (Bryant Deposition, Oct. 21, 2005) ("Q.  Was it your typical practice, Mr. Bryant, to e-mail your requests for publication to the various public affairs officials?  A.  Yes, it is. . . ."). *See also id.* at Tr. 44:35-45:1-6 ("A.  I have been told that the preferred procedure for these ad submissions is to first submit the ad to the printer, but because of my experience with the Pentagram, I was frustrated in that and didn't want to have to repeat that every time I had an ad submission.  So I chose to go the direct route to get that through publication review on the part of the pertinent public affairs office.").

Furthermore, the Court does not incorporate Defendants' argument that "[u]nlike an editorial, the public affairs office does not decide whether to publish an advertisement.  The decision whether to publish an advertisement rests with the commercial publishers of the CENs[,]" into its decision, as it is clear that both under the regulations and in practice, Defendants have significant latitude to control the content of advertisements included in the CENs and ultimately distributed.  *See* Defs.'s Opp'n at 4; Def.'s Mem. for Summ. J. at 14.  And while Plaintiff makes no argument to in this regard in his Motion for Summary Judgment, neither can Plaintiff rely on DODI 5120.4, E4.1.7.1 (which states that the advertising section is the responsibility of the CEN publisher) for the premise that "Defendants violated the Defense Department's own requirement not to control advertising content of CEN's [sic] by requiring that numerous of Plaintiff's Advertisements not be published."  1st Compl. ¶¶ 11, 12; 2nd Compl. ¶¶ 19, 20.

34

Defendants from continuing to reject the Advertisement[s]."  1st Compl. at 8; 2nd Compl. at 17.

"The well-settled requirements for a permanent injunction are adopted from the requirements for

a preliminary injunction, as stated in *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 673-74 (D.C.

Cir.1985) and *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841,

843 (D.C. Cir.1977): (1) success on the merits; (2) irreparable harm absent the injunction; (3) the

balance of hardship tips in favor of the plaintiff if an injunction is not granted; and (4) the public

interest lies in granting an injunction."  *Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F.

Supp. 2d 33, 44 (D.D.C. 2000).  However, where a Plaintiff cannot demonstrate success on the

merits, the Court need not proceed further in determining that injunctive relief is not warranted.

*See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 182 (D.C. Cir. 2006) ("In light of its decision

to grant the FTC's motion to dismiss, the court concluded, inter alia, that Trudeau had no

likelihood of success on the merits.  Because we affirm the district court's grant of the FTC's

Rule 12(b)(6) motion, we affirm the denial of the preliminary injunction as well.  *See Michigan*

*State v. Miller,* 103 F.3d 1240, 1249 (6th Cir. 1997) (holding that a court may not issue a

preliminary injunction where the plaintiff has no likelihood of success on the merits); *Transohio*

*Sav. Bank v. Dir., Office of Thrift Supervision,* 967 F.2d 598, 614 (D.C. Cir. 1992) (affirming

denial of preliminary injunction where the district court properly concluded that the plaintiff had

'no likelihood of success on the merits').").  As demonstrated above, Plaintiff does not succeed

on the merits of his claims.  Since Plaintiff has not demonstrated any possibility of success on the

merits, and his cases are being dismissed, the Court shall appropriately deny his request for

injunctive relief.

>    D.      *Plaintiff's Request for Attorney's Fees pursuant to 42 U.S.C. § 1988*

Pursuant to 42 U.S.C. § 1988:

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 [20 U.S.C.A. § 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.A. § 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C.A. § 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

42 U.S.C.A. § 1988.  While Plaintiff allegedly brings his actions for violation of the First and Fifth Amendments pursuant to 42 U.S.C. § 1983, see 1st Compl. ¶ 2 and 2nd Compl. ¶ 2, 42 U.S.C. § 1983 pertains to actions against state, not federal actors.  In order for an action to fall within the rubric of 42 U.S.C. § 1983, such action must be taken "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983.  An individual alleging a violation of Section 1983 must demonstrate that the alleged deprivation of constitutional rights was committed by a person or entity acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2255, 101 L. Ed. 2d 40 (1988); *Hoai v. Vo*, 935 F.2d 308, 312 (D.C. Cir. 1991).  Plaintiff's Complaints allege violations of his constitutional rights by federal actors–not state actors.  *See supra* note 2.  Accordingly, even if Plaintiff had succeeded on his claims, he would not be eligible for attorneys' fees pursuant to 42 U.S.C. § 1988, as his claims–even absent a stated link–also do not fall within any of the other provisions cited therein.

E.      *Plaintiff's "Praecipe Requesting Oral Argument"*

On January 30, 2007, Plaintiff filed a "Praecipe Requesting Oral Argument."  In

Plaintiff's "Praecipe," Plaintiff requests a hearing with respect to the dispositive motions at issue, with Plaintiff's counsel stating that "[u]ndersigned counsel recalls the Court, at the last hearing in this matter, indicating an intention to hold hearings in 2006 on the parties' Summary Judgment Motions." Praecipe at 1.

Upon examination of a draft transcript of the last status hearing in this matter, held on November 2, 2005, the Court finds that it made no such representation to the Parties. In fact, the Parties had not yet filed their cross-motions, such that the Court would not yet know if a hearing with respect to said unfiled motions would be necessary. Upon examination of said motions, it is clear to the Court that a hearing is not necessary. The Court cautions Plaintiff's counsel about making such blatant misrepresentations with respect to a Court's assertions.

## IV.  CONCLUSION

Based on the foregoing reasoning, the Court shall DENY Plaintiff's Motion for Summary Judgment, GRANT Defendant's Motion to Dismiss or for Summary Judgment, DENY Plaintiff's Motion for a Hearing, and DISMISS the instant cases. An Order accompanies this Memorandum Opinion.


Date:   March 12, 2007


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge